IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KRISTIE PUTT, et al.,<br><br>        *Plaintiffs,*<br><br>v.<br><br>TRIPADVISOR INC., et al.,<br><br>        *Defendants.* | CIVIL ACTION<br>NO. 20-3836 |

**PAPPERT, J.**                                                                       January 25, 2021

## MEMORANDUM

Kristie Putt was injured in front of her sons Gary and Grayson on a tour in New Zealand that she booked through Viator, Inc., a subsidiary of TripAdvisor LLC. Putt and her sons sued Viator and TripAdvisor, Inc., TripAdvisor LLC's parent company, for negligence, misrepresentation and negligent infliction of emotional distress. Defendants move to dismiss the Complaint, and the Court denies the Motion for the reasons that follow.

I

A

Viator hosts a website allowing customers to book and purchase tours and browse customer reviews of tour packages. (Compl. ¶ 16, ECF No. 1-4.). Plaintiffs allege Viator and TripAdvisor "sell and advertise travel services to customers wherein the point of sale is at the customer's location." (*Id.*) They "target customers throughout the country" and "recommend and place their customers with tour operators, and guide their customers in designing a tour itinerary." (*Id.* at ¶ 18.)

On August 15, 2017, "Defendants brought their guidance to bear" when Ms. Putt used Viator's website to book a three-day tour package in New Zealand. (*Id.* at ¶¶ 9, 14, 19, 26.) The tour was to be operated by Canterbury Leisure Tours, which also supplied the tour's travel services. (*Id.* at ¶ 26.) Ms. Putt booked the tour for herself and her sons from October 22 through October 24. (*Id.* at ¶ 9.)

On October 23, Ms. Putt and her sons boarded a bus run by Dune Rider Unique Tours for a day trip that included a drive along Ninety Mile Beach. (*Id.* at ¶¶ 25, 32–33.) She sat in the bus's back seat next to a window and her sons sat nearby. (*Id.* at ¶¶ 32, 33.) The bus had its seatbelts ripped out and the driver, without addressing the missing seatbelts, advising passengers of safety precautions they could take or warning passengers the drive could get bumpy, sped along the beach. (*Id.* ¶¶ 27, 29–31, 35.) At one point he hit a large ditch that "threw every person on the bus out of their seats." (*Id.* at ¶ 36.) Ms. Putt "was flung three feet into the air, at least twice, and also flung against the window and side of the bus." (*Id.* at ¶ 38.) She hit her head, neck and shoulders on the bus's roof "with such force that the roof was dented" and her glasses "flew off her face." (*Id.* at ¶¶ 39–40.) She also "slammed her right side, including her head, arm[] and shoulder with force against the window and side of the bus." (*Id.* at ¶ 41.) She experienced a concussion and suffered traumatic injuries to her head, neck, shoulders, back and spine. (*Id.* at ¶ 44.) Her sons witnessed her being injured. (*Id.* at ¶ 42.)

Ms. Putt was taken to the hospital immediately after the incident where she was x-rayed, treated and eventually discharged. (*Id.* at ¶ 46.) Her sons watched as she was removed from the bus by emergency medical personnel and placed on a gurney with a

neck brace, rode with her in the ambulance and "were terrified." (*Id.* at ¶ 45.) After she was discharged, Ms. Putt continued to experience pain in her head, right arm, right shoulder, collarbone and back as well as substantial limitations in movement. (*Id.* at ¶ 48.) The rest of Plaintiffs' New Zealand trip was ruined, and after the trip Ms. Putt endured "endless doctor's visits, testing and injections" which revealed she fractured her C7 vertebra. (*Id.* at ¶¶ 49–51.) She eventually underwent surgery on her right shoulder. (*Id.* at ¶ 54.)

Ms. Putt alleges she has been in pain daily, has continued to suffer emotionally, physically and financially in the years since the incident and believes her injuries may be permanent. (*Id.* at ¶¶ 58, 60–65.) Her sons also have injuries and damages that may be permanent, including severe emotional distress and related physical manifestations. (*Id.* at ¶¶ 60, 66.)

B

Plaintiffs filed this suit as well as a separate suit against Canterbury Leisure Tours in the Philadelphia County Court of Common Pleas. *See generally* (Compl.); (Mot. to Dismiss 2 n.2, ECF No. 6-3). They filed their Complaint on July 7, 2020 and Defendants removed to this Court on August 6 based on diversity. *See generally* (Compl.); *see also* (Notice of Removal ¶ 6, 8–9, ECF No. 1).[1] Plaintiffs claim Defendants are responsible for their injuries because Defendants failed to use reasonable care in

---

[1] Defendants contend venue is improper here because Plaintiffs live in Tyrone, Pennsylvania, outside the Eastern District. *See* (Defs.' Reply 7–8, ECF No. 11). The Court disagrees. 28 U.S.C. § 1441(a) "expressly provides that the proper venue of a removed action is 'the district court of the United States for the district and division embracing the place where such action is pending'" and 28 U.S.C. § 1391 "has no application to this case because this is a removed action." *Polizzi v. Cowles Magazines, Inc.*, 345 U.S. 663, 665–66 (1953); *accord Leonetti's Frozen Foods, Inc. v. Crew, Inc.*, 140 F. Supp. 3d 388, 393 (E.D. Pa. 2015).

their duties to investigate, examine, select, monitor and supervise their tour operators to ensure they operated safely and were qualified as well as to disclose any information relating to whether they vetted Plaintiffs' tour operator or the risks associated with Plaintiffs' tour, thereby "misrepresent[ing] and/or conceal[ing] material facts and perpetuat[ing] the illusion that the bus tour would be operated by qualified, vetted[] and safe operators." *See* (Compl. ¶¶ 69–72, 74, 77–79, 81–82).

Defendants argue that Plaintiffs' claims are barred for three reasons: (1) Defendants are immune from suit as publishers of third-party content pursuant to Section 230 of the Communications Decency Act; (2) Plaintiffs waived their claims in a binding agreement they entered with Defendants; and (3) the same agreement's forum selection clause requires Plaintiffs to sue in Massachusetts. (Mot. to Dismiss 2–3.)[2]

II

To survive dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the facts pled "allow[] the court to draw the reasonable inference that

---

[2] In their Reply, Defendants argue for the first time that Plaintiffs failed to plead the requisite elements of negligence. (Defs. Reply 10, ECF No. 11). Plaintiffs claim in their Response that Defendants are travel agents and owed Plaintiffs a duty of care in that capacity, which Plaintiffs did not allege in their Complaint. *See* (*id.* at 8–9). Defendants need not, however, respond to this allegation because Plaintiffs are not entitled to raise new claims in response to Defendants' Motion. *See Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1989) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.") (internal quotations and citation omitted); *accord Doe v. Casino*, 381 F. Supp. 3d 425, 437 (E.D. Pa. 2019). If Defendants wish to generally assert a new ground for dismissal, they cannot do so in a reply. *See Baker v. Pennsylvania Econ. League, Inc. Retirement Income Plan*, 811 F. Supp. 2d 1136, 1144 n.7 (E.D. Pa. 2011) ("A reply brief is intended only to provide an opportunity to respond to the arguments raised in the response brief; it is not intended as a forum to raise new issues.") (quoting *United States v. Martin*, 454 F. Supp. 2d 278, 281 n.3 (E.D. Pa. 2006).

[a] defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

When a complaint includes well-pleaded factual allegations, a court "should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 679). However, this "presumption of truth attaches only to those allegations for which there is sufficient factual matter to render them plausible on their face." *Schuchardt v. President of the United States*, 839 F.3d 336, 347 (3d Cir. 2016) (internal quotation and citation omitted). "Conclusory assertions of fact and legal conclusions are not entitled to the same presumption." *Id.* This plausibility determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* (quoting *Connelly*, 809 F.3d at 786–87).

While "courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record" in deciding a motion to dismiss, *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993), "an exception to the general rule is that a 'document *integral to or explicitly relied upon* in the complaint' may be considered 'without converting the motion into one for summary judgment.'" *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (emphasis in original) (citation omitted). "[W]hat is critical is whether the claims in the complaint are 'based' on an extrinsic document and not merely whether the extrinsic document was explicitly cited." *Id.*

District Courts in the Third Circuit "may grant a Rule 12(b)(6) motion on the basis of an affirmative defense '*if* the predicate establishing the defense is apparent *from the face of the complaint.*'" *Brody v. Hankin*, 145 F. App'x 768, 771 (3d Cir. 2005) (quoting *Bethel v. Jendoco Constr. Corp.*, 570 F.2d 1168, 1174 n.10 (3d Cir. 1978) (emphasis in original)); *cf. Worldcom, Inc. v. Graphnet, Inc.*, 343 F.3d 651, 657 (3d Cir. 2003) ("[W]ith some exceptions, affirmative defenses should be raised in responsive pleadings, not in pre-answer motions brought under Rule 12(b)" because "[t]he facts necessary to establish an affirmative defense must generally come from matters outside of the complaint."). "Whether a particular ground for opposing a claim may be the basis for dismissal for failure to state a claim depends on whether the allegations in the complaint suffice to establish that ground, not on the nature of the ground in the abstract." *Jones v. Bock*, 549 U.S. 199, 215 (2007). A defendant bears the burdens of production and persuasion for affirmative defenses. *See Moore v. Kulicke & Soffa Indus., Inc.*, 318 F.3d 561, 566 (3d Cir. 2003). "Under Federal Rule of Civil Procedure 8, a complaint need not anticipate or overcome affirmative defenses; thus, a complaint does not fail to state a claim simply because it omits facts that would defeat" an affirmative defense. *Schmidt v. Skolas*, 770 F.3d 241, 248 (3d Cir. 2014).

III

A

Plaintiffs' Complaint fairly establishes the predicate for Defendants' claim that they are entitled to immunity under Section 230 of the Communications Decency Act ("CDA") because it contains allegations discussing or alluding to Viator's website, the content thereon and Defendants' actions and duties relating to the content. *See*

6

*generally* (Compl. ¶¶ 14, 16–24, 69–72, 74, 77–80).  Nonetheless, Defendants have not shown they are immune from liability at this stage of the litigation.

Section 230 immunizes from liability (1) an interactive computer service provider (2) whom a plaintiff seeks to treat as a publisher or speaker of information (3) provided by another information content provider and states "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."  47 U.S.C. §§ 230(c)(1), (e)(3); *see also Green v. Am. Online (AOL)*, 318 F.3d 465, 470–71 (3d Cir. 2003); *Dimeo v. Max*, 433 F. Supp. 2d 523, 528–29 (E.D. Pa. 2006), *aff'd* 248 F. App'x 280 (3d Cir. 2007).  In part, it proscribes liability for a service provider's "decisions relating to the monitoring, screening, and deletion of content from its network—actions quintessentially related to a publisher's role."  *Green*, 318 F.3d at 471.  "Federal Courts have interpreted the statute as providing broad immunity from claims that would hold websites liable for dissemination of information originating from a third party."  *Moretti v. Hertz Corp.*, No. 14-469, 2017 WL 1032783, at *2 (D. Del. Mar. 17, 2017) (citing *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254–55 (4th Cir. 2009).  "Under the statutory scheme, an 'interactive computer service' qualifies for immunity so long as it does not also function as an 'information content provider' for the portion of the statement or publication at issue."  *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003).

Defendants contend Plaintiffs' claims against them are barred by Section 230 because Defendants provide an interactive computer service, Plaintiffs' claims "arise solely from content that was created by Canterbury" and Plaintiffs seek to hold Defendants liable as the publisher of Canterbury's statements.  *See* (Mot. to Dismiss

12–17). Plaintiffs do not contest that Defendants provide an interactive computer service, but they argue Section 230 does not entitle Defendants to immunity because they are information content providers ineligible for CDA protection based on their "tight[] control" over tour operator posts on Viator's website. *See* (Pls.' Resp. 6–8, ECF No. 10). They also assert their claims do not arise entirely from third-party content— they seek to hold Defendants accountable for their own negligent conduct, which the CDA does not immunize. *See* (*Id.* at 5–6); *see also Saponaro v. Grindr, LLC*, 93 F. Supp. 3d 319, 323 n.3 (D.N.J. 2015) ("The CDA was not meant to immunize internet service providers for *all* activity on their websites; they are, indeed, still responsible for their own wrongful conduct.") (emphasis in original).

The Court cannot yet conclude that Defendants did not function as information content providers. *See Moretti*, 2017 WL 1032783, at *3.[3] The CDA defines "information content provider" broadly to include "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive service." 47 U.S.C. § 230(f)(3). "Accordingly, there may be several information content providers with respect to a single item of information (each being 'responsible,' at least 'in part,' for its 'creation or development')." *Pace v. Baker-White*, 432 F. Supp. 3d 495, 507–08 (E.D. Pa. 2020) (quoting *Fed. Trade Comm'n v. Accusearch Inc.*, 570 F.3d 1187, 1197 (10th Cir. 2009)). While Plaintiffs do not allege the extent of Defendants' contributions to the content on

---

[3] In their Response, Plaintiffs assert Defendants "are undeniably information content providers" based on language in Defendants' Supplier Agreement and Defendants' Product Quality Standards, which Plaintiffs append as exhibits. Plaintiffs again attempt in their Response to introduce facts not alleged in their Complaint. *See Com. of Pa. ex rel. Zimmerman*, 836 F.2d at 181 (3d Cir. 1989). The Court declines to consider these new documents or allegations in deciding Defendants' Motion.

8

Viator's website, they are "not required to anticipate and plead around an affirmative defense such as Section 230," and therefore the Court "cannot treat the Complaint's silence . . . as an affirmative allegation" that Defendants are not responsible for content creation or development. *Moretti,* 2017 WL 1032783, at *4.

Moreover, while some of Plaintiffs' claims may arise from content created by Canterbury, Plaintiffs' seek to hold Defendants accountable as information content providers. Specifically, they allege that Defendants' own misrepresentations and omissions induced Plaintiffs to book their tour. *See Pirozzi v. Apple Inc.*, 913 F. Supp. 2d 840, 849 (N.D. Cal. 2012) ("To the extent Plaintiff's claims allege that Apple's misrepresentations induced Plaintiff to purchase an Apple Device . . . . even if Apple acts as an 'interactive computer service,' Plaintiff seeks to hold it liable as the 'information content provider' for the statements at issue.").

B

Defendants attached as an exhibit to their Motion the terms and conditions agreement ("Agreement") from Viator's website. They also attached a declaration from the Vice President of Supply at TripAdvisor LLC (the "Dorsett Declaration") stating the Agreement was a "true and correct copy of the Viator Terms, Conditions, and Notices that were in effect on August 15, 2017." *See generally* (Mot. to Dismiss Ex. B, ECF No. 6-5). The Agreement was not referenced in or attached to Plaintiffs' Complaint, but Defendants contend it bars Plaintiffs' claims. *See generally* (Compl.). Plaintiffs did not contest the authenticity of the Agreement in their Response.

The Agreement is integral to or explicitly relied upon in the Complaint because Plaintiffs base certain of their allegations on it. *See* (Compl. ¶¶ 14, 16). The Complaint

thus fairly establishes the predicate for Defendants' arguments that the Agreement bars this suit and the Court may consider both the Agreement's content and Defendants' claims. *See Pryor v. NCAA*, 288 F.3d 548, 560 (3d Cir. 2002) ("[D]ocuments whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered."); *accord Santomenno ex rel. John Hancock Trust v. John Hancock Life Ins. Co. (U.S.A.)*, 768 F.3d 284, 290 (3d Cir. 2014).

Defendants argue they cannot be liable for Plaintiffs' injuries and Plaintiffs agreed to litigate any claims against them in Massachusetts. (Mot. to Dismiss 17–20.) Specifically, the Agreement contains an exculpatory clause entitled "Our Liability" where Defendants "disclaim all liability for[] any errors or other inaccuracies relating to the information and description of the products and services displayed on [the Viator] website." (Mot. to Dismiss Ex. B 10). The agreement also states that "third-party suppliers and private tour guides providing products or other services on th[e] website are independent contractors" for whom Defendants are not liable. (*Id.*).[4] The clause further states:

> In no event shall the Viator Group Companies (or their officers, directors and affiliates) be liable for any direct, indirect, punitive, incidental, special, exemplary or consequential damages . . . arising out of, or in any way connected with, product or service bookings made by you through this website . . . .

(*Id.* at 11.) The Agreement also contains a forum selection clause, entitled "Jurisdiction and Governing Law":

> This Website is operated by a U.S. entity and this Agreement is governed by the laws of the Commonwealth of Massachusetts, USA. You hereby consent to the exclusive jurisdiction and venue of courts in Boston, Massachusetts, USA and

---

[4] Citations to Motion exhibits reflect page numbers generated by the Court's electronic case filing system.

10

> stipulate to the fairness and convenience in such courts for all disputes arising out of or relating to the use of this Website. You agree that all claims you may have against Viator, Inc. arising from or relating to this Website must be heard and resolved in a court of competent subject matter jurisdiction located in Boston, Massachusetts. . . . .

(*Id.* at 20.)

Plaintiffs respond they cannot be bound by the Agreement because they did not assent to the exculpatory or forum selection clauses. *See* (Pls.' Resp. 10–13). They allege the Agreement is "an unenforceable browsewrap agreement that failed to provide Ms. Putt with actual or constructive notice of the Terms and Conditions on Viator's website." (*Id.* at 11). They contend Ms. Putt used Viator's website without reading or assenting to the Agreement and the Agreement was not displayed in a way that a reasonable user would notice. (*Id.*). While the website's main text was in large black font contrasted against a white background, a hyperlink to the Agreement only appeared in small blue font against a blue footer "*below* other non-significant links" at the bottom of the page. (*Id.* (emphasis in original).) Within the Agreement, the exculpatory clause was located at the end separated by an "ambiguous" heading. (*Id.*).

In their Reply, Defendants introduce a screenshot of the checkout page on Viator's website, which shows it contains text immediately below a "Book Now" button stating "[b]y clicking Book Now and making a reservation, I acknowledge that I have read and agree to be bound by Viator's Terms and Conditions and Privacy Statement." (Defs.' Reply 5.) The text is primarily black against a white background, but "Viator's Terms and Conditions" and "Privacy Statement" appear in blue and Defendants represent "Viator's Terms and Conditions" is hyperlinked to the Agreement. *See* (*id.*). Defendants contend the screenshot shows the Agreement is a clickwrap, instead of

11

browsewrap, agreement and the Agreement does not merely "exist passively at the bottom of Defendants' website." (*Id.* at 5–6.) Defendants do not say the screenshot is the screen Ms. Putt viewed while booking her tour on August 15, 2017. *See generally* (*id.*).[5]

Agreements appearing on internet webpages are often referred to as either "clickwrap" or "browsewrap" agreements. *See Zabokritsky v. JetSmarter, Inc.*, No. 19-273, 2019 WL 2563738, at *3 n.30 (E.D. Pa. June 20, 2019). A clickwrap agreement generally requires a webpage user to actively consent to terms or conditions, such as by clicking "accept" or checking a dialog box to proceed with an internet transaction. *See James v. Glob. TelLink Corp.*, 852 F.3d 262, 267 (3d Cir. 2017); *HealthPlanCRM LLC v. AvMed, Inc.*, 458 F. Supp. 3d 308, 334 (W.D. Pa. 2020); *Feldman v. Google, Inc.*, 513 F. Supp. 2d 229, 236 (E.D. Pa. 2007). A browsewrap agreement is "generally posted on a website via hyperlink at the bottom of the screen" and "do[es] not require users to expressly manifest assent." *Glob. TelLink Corp.*, 852 F.3d at 267. Clickwrap agreements are "routinely enforced by the courts." *HealthPlanCRM*, 458 F. Supp. 3d at 334 (citing *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017) ("Courts routinely uphold clickwrap agreements for the principal reason that the user has affirmatively assented to the terms of agreement by clicking 'I agree.'")). A browsewrap agreement's enforceability "often turn[s] on whether the terms or a hyperlink to the terms are

---

[5] Although Defendants cite to it in discussing the screenshot, *see* (Defs.' Reply 5–6), the Dorsett Declaration appended to Defendants' initial Motion does not authenticate the screenshot. Dorsett states "[i]n order to book any tour through Viator, an individual is required to agree to the Terms and Conditions. Accordingly, Plaintiffs would not have been able to book a tour through Viator without consenting to the Terms and Conditions and forming an agreement." (Mot. to Dismiss Ex. B 2.) She does not explain how an individual is "required to agree" to Viator's terms and conditions, nor does she describe how the terms and conditions are presented on the website.

reasonably conspicuous on a webpage." *Glob. TelLink Corp.*, 852 F.3d at 267. "Where [a] website contains an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound, courts have been more amenable to enforcing browsewrap agreements." *Id.* (quoting *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014).

The Court cannot resolve the enforceability of the Agreement at this stage. Whether the Agreement is clickwrap or browsewrap, as well as whether it was reasonably conspicuous such that Ms. Putt should have been on notice that she would be bound by it, depends on how it was presented on Viator's website when Ms. Putt booked the tour. The Court cannot consider the screenshot Defendants provided in their Reply because it is undated and Plaintiffs have had no opportunity to contest its accuracy. *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 231 (2d Cir. 2016) ("Even where a document is considered 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document.") (internal quotations and citation omitted); *cf. Cooper-Booth Transp. Co., L.P. v. Daimler Trucks of North America, LLC*, No. 5:17-cv-3884, 2018 WL 1940527, at *2 (E.D. Pa. Apr. 24, 2018) (declining to consider documents found not part of plaintiff's pleadings because plaintiff contested their authenticity). The Parties also appear to disagree markedly on the Agreement's presentation on the website—Plaintiffs' description of its placement is irreconcilable with the screenshot.

The Court also declines to take judicial notice of Viator's website because it may have looked different when Ms. Putt booked her tour. *See* (Mot. to Dismiss 9).

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*

GERALD J. PAPPERT, J.